**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**
**MILWAUKEE DIVISION**

| | |
|---|---|
| Marybeth Nuutinen, Individually and as special administrator of the Estate of Charles H. Nuutinen, Deceased,<br><br>               Plaintiff,<br><br>  v.<br><br>CBS Corporation, et al.,<br>               Defendants | E.D. WI (Milwaukee)<br><br>Case No. 97-CV-678 |

<u>PLAINTIFF'S RESPONSE IN OPPOSITION TO</u>
<u>CBS CORPORATION'S FOR SUMMARY JUDGMENT</u>

Plaintiff opposes the motion for summary judgment of defendant CBS Corporation

("CBS", formerly known as "Westinghouse").

<u>Introduction</u>

This case is set for trial to begin on May 11, 2015. The case involves exposure to

CBS/Westinghouse turbine and swtichgear products. The instant motion seeks dismissal of

claims based on turbine exposure on the basis they are barred by the Wisconsin construction

statute of repose ("CSOR"). Regardless of any ruling on the turbine exposure, the case will

proceed to trial on the switchgear exposure. Plaintiff's position is the turbine exposure presents

factual questions for jury resolution. The alleged bar to claims by application of the statute of

repose involves disputed issues of fact which can be taken with case for resolution by the jury or

as a motion for directed verdict.

<u>Procedural History</u>

1

- On December 4, 2013, CBS filed a motion and memorandum for summary judgment with the MDL Court on the basis that the evidence fails to raise any genuine issue of fact as to CBS' alleged liability.

- On March 20, 2014, the MDL Court denied summary judgment to CBS and held that the application of the CSOR is more properly handled by the transferor court.

- On February 11, 2015 CBS filed motion for leave to file renewed motion for summary judgment.

<u>Standard of Review</u>

"Summary judgment is appropriate if the evidence demonstrates that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Harris v. Warrick County Sheriff's Dep't, 666 F.3d 444, 447 (7th Cir. 2012). Summary judgment is reviewed by "construing the record in the light most favorable to the nonmovant and drawing all reasonable inferences in his favor." Simpson v. Beaver Dam Cmty. Hosps., Inc., 2015 U.S. App. LEXIS 3830, 11 (7th Cir. Mar. 11, 2015). "A genuine dispute of material fact exists only when the evidence could support a reasonable jury's verdict for the non-moving party." Crawford v. Countrywide Home Loans, Inc., 647 F.3d 642, 650 (7th Cir. 2011).

<u>Statement of Facts</u>

I. Response to CBS statement of facts

CBS did not follow the rules of this court requiring numbered factual paragraphs. (Pl.'s Ex. 22.) Plaintiff can only respond in the same fashion without numbering. Plaintiff specifically references affidavits, declarations, parts of the record, and other supporting materials relied upon in Plaintiff's statement of facts section.

Plaintiff disputes the summary of the testimony of Gary Vohs, a coworker of Mr. Nuutinen presented in the first full paragraph in page 3 of the CBS memorandum of law. (Pl.'s Ex. 22, at 3.) Vohs and Nuutinen worked on both the new installation of one turbine and at least two outages at Point Beach Powerhouse. Turbine insulation[1] work was ongoing throughout the jobs at Point beach. Vohs usually worked on the floor underneath the main turbine floor when he was him the area of the turbine. Vohs was usually not in a position to observe what work was being done on the turbine floor and was also concentrating on pipefitting duties and not insulation work.

Plaintiff disputes the statement suggesting all components of the Westinghouse turbine-generator units are "custom-designed." (Pl.'s Ex. 22, at 4, first full paragraph.) The insulation materials were made pursuant to standard Westinghouse process specifications which were used for all turbines and were not "custom designed" for Point Beach Powerhouse.

Plaintiff disputes the statement that "a" Westinghouse engineer was on site for the work at Point Beach Powerhouse. (Pl.'s Ex. 22, at 4, second full paragraph.) Westinghouse had multiple personnel on site to oversee and perform the work.

Plaintiff disputes the characterization of the Westinghouse turbines as "permanent fixtures." (Pl.'s Ex. 22, at 4, third full paragraph.) Each turbine was disassembled annually during "outages" lasting 4 weeks or longer which involved extensive removal and reinstallation of asbestos insulation.

Plaintiff does not dispute the other CBS fact statements. Additional facts relating to the above contested facts and other matters are set forth below in the numbered fact paragraphs submitted by plaintiff.

---

[1] The term insulation in this brief refers to thermal insulation material

3

II. Additional facts requiring denial of summary judgment

Plaintiff has followed the local rules to number factual statements and has added headings to break the facts into subject matter areas which correspond to the argument.

*Introduction*

1. In opposing this motion, Plaintiff relies on testimony of William LaPointe ("LaPointe"), Gary Vohs ("Vohs"), and Doug Ware ("Ware") who gave depositions as well as documents provided by CBS during discovery.

2. LaPointe is Plaintiff's expert on turbines and was a millwright who performed service work on turbines as a part of his profession. (Pl.'s Ex. 6, at 1.)

3. LaPointe personally worked on turbine outages at Point Beach. (Pl.'s Ex. 7, at 1.)

4. Vohs was a steamfitter and a member of Local 400 who worked directly with Nuutinen at Point Beach on numerous occasions. (Pl.'s Ex. 2, at 9, 45-46; Pl.'s Ex. 1, at 15.)

5. Ware, CBS' corporate designee, worked out of the Westinghouse Chicago office beginning in 1965 and from 1973 to 1981 he worked as a district manager supervising service engineers that worked on turbines. (Pl.'s Ex. 10, at 4; Pl.'s Ex. 11, at 2, 4.)

6. Ware became western regional manager for Westinghouse followed by an international position. (Pl.'s Ex. 11, at 5.)

7. Charles Nuutinen ("Nuutinen") was a pipe-fitter and a member of Plumbers Local 400 in Appleton, Wisconsin. (Pl.'s Ex. 1, at 6, 8.)

8. Nuutinen died in 2010 before he could give testimony in the case. (Pl.'s Ex. 9)

9. Nuutinen worked as a pipe-fitter from 1959 through 1996 and his duties included installation of new piping and maintenance and repair work on existing piping. (Pl.'s Ex. 1, at 6, 13-14.)

10. Nuutinen worked at the Point Beach nuclear power point ("Point Beach"). (Pl.'s Ex. 1, at 13.)

11. In September 2010 Nuutinen was diagnosed with malignant mesothelioma. (Pl.'s Ex. 8, at 1.)

12. Nuutinen died on December 7, 2010 from this mesothelioma. (Pl.'s Ex. 9.)

13. Dr. Jerrold Abraham determined Nuutinen developed mesothelioma from his occupational exposure to asbestos. (Pl.'s Ex. 8, at 1.)

14. Dr. Abraham also determined, based on Nuutinen's work history, that Nuutinen's cumulative asbestos exposure, from any and all products, contributed to his mesothelioma and death. (Pl.'s Ex. 8, at 1.)


*Nuutinen was exposed to asbestos from turbines at Point Beach*

15. Evidence shows Nuutinen was exposed to asbestos containing insulation during initial installation of Westinghouse Point Beach turbines and outage work on Westinghouse Point Beach turbines.

16. On March 20, 2014, Judge Robreno, the asbestos MDL-875 Supervising District Court Judge, denied summary judgment to CBS. Judge Robreno found evidence that Nuutinen was exposed to asbestos containing dust from insulation supplied and installed by Westinghouse at Point Beach during the initial installation process in the late 1960s and during maintenance work in the 1970s. (Pl.'s Ex. 5, at 11.)

17. In ruling on the CBS motion for Summary judgment, Judge Robreno deferred to the remand court to handle the state law issue of the application of Wis. Stat 893.89, referred to in this brief as the CSOR. (Pl.'s Ex. 5, at 11-12.)

5

*Original Installation*

18. Vohs worked with Nuutinen for several months on the installation of the first of the two Westinghouse turbines at Point Beach in the 1960s. (Pl.'s Ex. 2, at 45-46; Pl.'s Ex. 4, at ¶2.)

19. The Pont Beach turbine had the name Westinghouse on it. (Pl.'s Ex. 2, at 46.)

20. Nuutinen and Vohs performed "pipefitting-type work, including working on the high pressure steam lines and the condensate lines." (Pl.'s Ex. 2, at 86.)

21. Vohs testified that, "asbestos insulation was being used in the areas we were working on a regular basis," including for pipe insulation and insulating the turbine itself, causing asbestos exposure when the turbine was being installed. (Pl.'s Ex. 2, at 48.)

22. For more than a week, Vohs and Nuutinen worked within 50-100 feet of insulators who were cutting and shaving block insulation with handsaws and mixing bags of insulating cement with water in buckets, both of which created dust. (Pl.'s Ex. 4, at ¶3, 4; Pl.'s Ex. 3, at 14.)

23. This insulation was placed onto the Westinghouse turbine. (Pl.'s Ex. 4, at ¶3.)


*Outage maintenance work*

24. Vohs and Nuutinen also worked at Point Beach "numerous times throughout the years in maintenance shutdowns." (Pl.'s Ex. 2, at 46.)

25. Vohs "worked on at least two outages at Point Beach with Charles Nuutinen in the area of the Westinghouse turbines in the 1970s. (Pl.'s Ex. 12.)

26. Maintenance work was performed during the Point Beach shutdowns. (Pl.'s Ex. 3, at 40.)

27. "Westinghouse employees always directed and supervised the Point Beach turbine outages which occurred before 1983. Westinghouse determined, directed, and supervised the areas

from which the insulation was removed and reinstalled during the outages. The work areas for the turbine outages at Point Beach were under the control of and occupied by Westinghouse personnel who were responsible for cleanup and safety practices in the work area. Westinghouse personnel also determined the insulation materials were reinstalled according to Westinghouse specifications." (Pl.'s Ex. 7, at 4-5.)

28. Point Beach outages lasted about four to six weeks. (Pl.'s Ex. 7, at 2.)

29. "During an outage blankets and other insulation are removed, the turbine is disassembled, valves inspected and repacked, gaskets changed, walls of piping and other metal parts inspected for cracks and thickness of metal and restored by welding to proper thickness, oil and other lubricants are drained and filtered, the bearing housing cleaned, linkage arms greased, and other inspection and other maintenance is performed. A turbine at Point beach could had about 3,000 gallons of oil which could take two weeks or longer to drain and clean." (Pl.'s Ex. 7, at 1.)

30. Nuutinen was exposed to the insulation work on the turbine system. (Pl.'s Ex. 2, at 48.)

31. Pipefitter crews were often in the outage work areas which were controlled and occupied by Westinghouse. (Pl.'s Ex. 7, at 5.)

32. Vohs, while repairing pipe with Nuutinen during a shutdown in the early 70s, saw insulators in their general area remove a removable asbestos blanket from a flange bolting to the turbine. (Pl.'s Ex. 2, at 91-93.)

33. "Removable insulation can be taken off and reused without damaging the insulation itself. Blankets are one example of removable turbine insulation. Other types of insulation such as the block or preformed or molded insulation can also be removed and reused many times. All

7

these types of removable insulation were used at Point Beach and create dust during removal, handling, and reinstallation." (Pl.'s Ex. 7, at 5.)

*Westinghouse outage work at Point Beach was maintenance and repair work*

34. "Point Beach had at least two scheduled outages per year through most or all of the period before 1983. Each unit had at least one outage at intervals of 12 months." (Pl.'s Ex. 7, at 2.)

35. "The purpose of the outage is to perform necessary inspection, maintenance and repair work required for proper operations of the turbine system." (Pl.'s Ex. 7, at 1.)

36. "Outages are contemplated in the original design engineering of the turbine system. Outages are also needed to maintain insurance coverage. For these and other reasons outages involving large turbines such as Point Beach are scheduled in advance. Unscheduled outages may also occur to make unexpected repairs." (Pl.'s Ex. 7, at 1.)

37. "None of the outages at Point Beach before 1983 resulted in any increase in the electrical power generating capacity of the units above the capacity for which the units were originally designed and constructed. The turbine outage work was all done in order to maintain the ability of the turbine systems to operate at the original capacity." (Pl.'s Ex. 7, at 2.)

38. Point Beach was shut down on a regular, scheduled, yearly basis for refueling and that maintenance work was performed at that time (Pl.'s Ex. 2, at 96; Pl.'s Ex. 3, at 40.)

39. "Normal preventative maintenance-type procedure" was done during shutdowns. Point Beach was also shut down to fix problems when necessary. (Pl.'s Ex. 2, at 96.)

40. Westinghouse inspection reports confirm that turbine outages at Point Beach were scheduled and that maintenance work was performed during outages. (Pl.'s Ex. 13, at 2, 12, 14, 16.)

41. Ware admitted the Westinghouse outage work was for "maintenance," describing the work as "turbine to turbine maintenance outages at Point Beach." (Pl.'s Ex. 10, at 22; Pl.'s Ex. 11, at 11.)

42. "The turbine system areas within the Westinghouse work area on an outage included the entire main turbine floor at all times, on a daily basis parts of the floor under the turbine floor, and parts of the basement area. Pipefitter crews were often in the outage work areas which were controlled and occupied by Westinghouse." (Pl.'s Ex. 7, at 4, 5.)


*Westinghouse manufactured and produced the insulation material for Point Beach*

43. Westinghouse not only made the metal parts, but also made the insulation materials for the turbine system. (Pl.'s Ex. 7, at 3.)

44. "Point Beach turbine asbestos insulation material was produced under the direction of Westinghouse in accordance with the insulation process specifications of Westinghouse." (Pl.'s Ex. 7, at 3.)

45. "Due to the importance of the insulation material to proper and safe operations, Westinghouse engineers always inspected the completed turbine to confirm the insulation material was produced and installed in accordance with the Westinghouse process specifications and drawings." (Pl.'s Ex. 7, at 4.)

46. Westinghouse "insulation process specifications had to be followed precisely to produce a proper insulation material to protect against the risk of equipment failure due to the heat loss." (Pl.'s Ex. 7, at 3.)

47. If the insulation didn't function properly, excessive heat caused "failure of lubricants" resulting in the equipment seizing up and stopping. (Pl.'s Ex. 7, at 3.)

9

48. "Point Beach turbine asbestos insulation material was produced under the direction of Westinghouse in accordance with the insulation process specifications of Westinghouse. Westinghouse had separate process specifications to produce different types of insulation materials including without limitation blankets, block & molded, block & plastic, and spray-on." (Pl.'s Ex. 7, at 3.)

49. Point Beach files contained four different process specifications to make asbestos insulation materials for the turbines from the Westinghouse engineering department. (Pl.'s Ex. 11, at 6; Pl.'s Ex. 14; Pl.'s Ex. 15; Pl.'s Ex. 16; Pl.'s Ex. 17.)

50. The specifications were not unique to the Point Beach project, but were used throughout all turbine projects of Westinghouse. (Pl.'s Ex. 7, at 3.)

51. The process in the specifications had to be followed and the completed work was inspected by Westinghouse. (Pl.'s Ex. 7, at 34.)

52. The insulation process specifications for Point Beach in the Westinghouse documents included:

    a. Removable Blanket Insulation (Pl.'s Ex. 15.)
    b. Block and Molded Insulation (Pl.'s Ex. 16.)
    c. Block and Plastic Insulation (Pl.'s Ex. 17.)
    d. Spray Insulation (Pl.'s Ex. 14.)

53. Westinghouse's "Process Specification Manufacture and Application of Blanket Insulation" document lists "requirements for constructing blankets." (Pl.'s Ex. 15, at 1.)

54. The document specifies the materials used by Westinghouse in their construction of asbestos blankets for turbine insulation systems. (Pl.'s Ex. 15, at 1.) The specifications call for use of raw asbestos cloth and yarn in the manufacture of blankets that are to be used in operations at

Case 2:97-cv-00678-RTR   Filed 03/20/15   Page 10 of 30   Document 187

temperatures of up to 600°f. incl., from 601°f. to 750°f., incl.(no longer std.), and from 751°f. to 950°f., incl.(no longer std.). (Pl.'s Ex. 15, at 1-2.)

55. Westinghouse's "Process Specification Application of Block and Molded Insulation" document describes the "detailed procedures necessary for the application of insulating block and/or pipe covering." (Pl.'s Ex. 16, at 1.)

56. The document specifies that asbestos containing block and molded material is used for Westinghouse turbines. (Pl.'s Ex. 16, at 1-2.)

57. Instructions are provided about how to "select" and "cut" block material, "fit" it to the surface, and "anchor" it with "retaining wires" to make a material that provides insulation. (Pl.'s Ex. 16, at 1.)

58. Molded material is layered "one over the other" and then "drawn together by means of wire loops" and asbestos cement is used to create the insulation. (Pl.'s Ex. 8, at 2.)

59. Westinghouse's "Process Specification Application of Block and Plastic Insulation" document describes the "detailed procedures necessary for the application of water resistant thermal insulating block." (Pl.'s Ex. 17, at 1.)

60. Asbestos containing block and plastic material is specified. (Pl.'s Ex. 17, at 1.)

61. Instructions are provided about how to "select" and "cut" block material, "secure" it to the surface with wire to make an insulating material. (Pl.'s Ex. 17, at 1.)

62. Plastic material is created by mixing water with dry components and then spreading that over wire netting to create an insulating product. (Pl.'s Ex. 17, at 1,2.)

63. Westinghouse's "Process Specification Application of Asbestos Compound by Spraying" document describes the process of using asbestos containing spray to create coats of insulation. (Pl.'s Ex. 14, at 1.)

64. Ware's description of process specifications are that "it starts with engineering providing the requirements for the whole turbine generator. And they did that by engineering drawings. And then they -- how to do were process specifications. It told manufacturing or field how to build or manufacture the turbine, process specifications." (Pl.'s Ex. 10, at 10)

65. Ware also had "never seen blankets manufactured in the field. Field service engineers didn't get involved in manufacturing blankets. That was done in a shop." (Pl.'s Ex. 10, at 15)

66. LaPointe confirmed that these Westinghouse "documents include detailed process specifications for producing the turbine insulation at Pont Beach. Other documents show the locations where the different types of insulation were placed at Point Beach and the asbestos content of ingredients in the insulation materials." (Pl.'s Ex. 7, at 2.)

67. Although some asbestos containing materials were supplied to Westinghouse by other sources, the raw materials would not be capable of being used as insulation materials. The raw materials must be used to construct insulation according to Westinghouse specifications.

68. The Westinghouse contract[2] with Wisconsin Michigan Power Company, the original Point Beach owner, is for the purchase of "One (1) Steam turbine generator unit." (Pl.'s Ex. 18, at 1, 3.)

69. "Insulating materials, in accordance with Westinghouse factory specifications for installation by others" are listed as a standard feature. (Pl.'s Ex. 18, at 4, 10.)

70. The contract states that title passes to the purchaser at point of shipment. (Pl.'s Ex. 18, at 2.)

71. A Westinghouse Engineer's Trip Report corroborates that the Point Beach turbine was a "Turn-Key station." (Pl.'s Ex. 20.)

---

[2] Westinghouse notes that no contract approval was written because it conformed to the Westinghouse proposal because there were no customer specifications for the unit. (Pl.'s Ex. 19, at 225.)

72. "Westinghouse supplied a fully insulated turbine at Point Beach manufactured in accordance with Westinghouse specifications." (Pl.'s Ex. 7, at 3.)

73. Ware stated that a turbine contract included "the design, the manufacture, the shipping of the turbine generator to the customer site." (Pl.'s Ex. 10, at 4)

*Insulation in Westinghouse Point Beach turbines performed as expected*

74. No problems in turbine operations at Point Beach were caused by the insulation materials as their manufacturer met specifications, the turbine system ran properly with the insulation, and the insulation was applied and removed in a normal and customary manner.

75. The Point Beach turbine insulation met process specifications and performed properly.

76. LaPointe, who worked 75% of the Point Beach outages before 1983, stated "use of asbestos insulation is not a 'defect or deficiency' in Point Beach turbine." (Pl.'s Ex. 7, at 2, 4.)

77. "Normal practice in turbine construction work was to use asbestos for insulation materials." (Pl.'s Ex. 7, at 3.)

78. "Turbine insulation is necessary to prevent heat loss during operation." (Pl.'s Ex. 7, at 3.)

79. "Improperly produced insulation . . . causes the oil on turbine bearings to 'cook' and results in the failure of the mechanical parts which will shut down the turbine." (Pl.'s Ex. 7, at 3.)

80. LaPointe declared that, "in my many days of work at Point Beach, I never heard the turbine system insulation failed to perform its proper function." (Pl.'s Ex. 7, at 4.)

81. Westinghouse's "Power Generation Service Start-Up Report" stated that Point Beach Unit #1 "operating very well" upon start-up. (Pl.'s Ex. 21.)

82. Westinghouse warranted, through contract, that the turbine delivered was free from defect in material, which included asbestos insulation, and workmanship. (Pl.'s Ex. 18, at 10, 19.)

13

83. "Outages are contemplated in the original design engineering of the turbine system." (Pl.'s Ex. 7, at 1.)

84. "The methods and tools used for removal and reinstallation of the asbestos insulation materials at Point Beach were normal and customary practices for the time period before 1983." (Pl.'s Ex. 7, at 4.)

*Westinghouse was an occupier during Point Beach outages*

85. Westinghouse had control of the turbine work area during outages at Point Beach. "Westinghouse employees always directed and supervised the Point Beach turbine outages which occurred before 1983." (Pl.'s Ex. 7, at 4.)

86. "The work areas for the turbine outages at Point Beach were under the control of and occupied by Westinghouse personnel who were responsible for cleanup and safety practices in the work area." (Pl.'s Ex. 7, at 4.)

87. "Westinghouse engineers or other personnel were always present for the outage work on large Westinghouse turbine systems, such as Point Beach, on a daily basis." (Pl.'s Ex. 7, at 2.)

88. Vohs confirmed that Westinghouse personnel were present during Point Beach shutdowns that Nuuitenen worked on. (Pl.'s Ex. 2, at 49.)

89. Vohs also understood that "the manufacturers supply the specifications to their equipment, and the equipment is installed according to those specifications on any job, whether it be Westinghouse, General Electric, or any other supplier." (Pl.'s Ex. 2, at 47.)

90. "Westinghouse determined, directed, and supervised the areas from which the insulation was removed and reinstalled during the outages." (Pl.'s Ex. 7, at 4.)

14

91. "Westinghouse personnel also determined the insulation materials were reinstalled according to Westinghouse specifications." (Pl.'s Ex. 7, at 4.)

92. "The turbine system areas within the Westinghouse work area on an outage included the entire main turbine floor at all times, on a daily basis parts of the floor under the turbine floor, and parts of the basement area. Pipefitter crews were often in the outage work areas which were controlled and occupied by Westinghouse." (Pl.'s Ex. 7, at 5.)

93. Westinghouse's corporate witness testified: "Once the unit went into service, we had the responsibility to be the interface with the customer, to answer technical questions, to provide parts and also provide field engineers, technical direction on sites during any kind of maintenance." (Pl.'s Ex. 11, at 4.)

94. Westinghouse's corporate witness testified that they "did a number of outages and we supplied the labor and we ran the jobs . . . especially the nuclear units. The service was basically the labor, the engineering, the field engineering and the labor, and we bring our tools." (Pl.'s Ex. 11, at 8.)

<u>Argument</u>

I. Introduction

The CSOR is an affirmative defense which states:

No cause of action may accrue and no action may be commenced, including an action for contribution or indemnity, against the owner or occupier of the property or against any person involved in the improvement to real property after the end of the exposure period, to recover damages for any injury to property, for any injury to the person, or for wrongful death, arising out of any deficiency or defect in the design, land surveying, planning, supervision or observation of construction of, the construction of, or the furnishing of materials for, the improvement to real property. This subsection does not affect the rights of any person injured as the result of any defect in any material used in an improvement to real property to commence an action for damages against the manufacturer or producer of the material.

15

Wis. Stat. § 893.89(2).

Disputed issues of material fact and questions of law about application of the CSOR include without limitation:

• Whether some of the exposures that caused injury attributable to Westinghouse was through maintenance or repair work as opposed to an improvement to real property.

• Whether Westinghouse was a manufacturer or producer of the turbine insulation which is excluded from statutory protection.

• Whether the turbine insulation is a "defect or deficiency" in the improvement.

• Whether Westinghouse was an "occupier" of the work area at Point Beach.

• Whether Nuutinen sustained damages before the CSOR became effective.

• Whether the CSOR is unconstitutional if interpreted in accordance with the CBS arguments.

II. Outage work not improvement to real property

Protection under the CSOR does not extend to Westinghouse for outage work because it is not an improvement to real property. The CSOR only protects persons involved in "the improvement to real property." Wis. Stat. § 893.89(2).

Judge Robreno found that Plaintiff was exposed to asbestos containing dust during "maintenance work." (Pl.'s Ex. 5, at 11.) Three witnesses, including CBS corporate designee all have testified that the outages on which Nuutinen worked were "maintenance." The outage work did not increase the generating capacity of the turbine. Westinghouse ran the outages and was directing the removal and reinstallation of asbestos containing insulation creating large amounts of dust. Westinghouse was responsible for direction and supervision of the entire scope of the

16

outage work including insulation removal, insulation reinstallation, work area, cleanup, and safety.  The purpose of outage work was to preform necessary inspection, maintenance, and repairs until the next outage occurred.  Outage work was scheduled to occur on a yearly basis for each unit.  The elapsed time period of Nuutinen's outage work exposures exceeded the period of his initial construction exposures.  Defendant's documents and testimony confirm that outage work consisted of maintenance. Drawing all inferences in favor of the Plaintiff as the nonmovant, a jury could find the exposures during outage work were not the result of an "improvement to real property."

Defendant did not distinguish claims related to work on turbines during outages from claims related to the initial construction of turbines. Defendant argued only that the initial construction of the Point Beach turbines was an improvement to real property, which Plaintiff concedes was an improvement for the purposes of this motion, but makes no reference to outage work. As such, Defendant has waived any claim that outage work constitutes an improvement to real property. Defendant has presented no evidence that outage work consisted of a "permanent addition" that "enhanced the capital value" of real property. Defendant has not reached their burden of showing there is no dispute as to whether there is a general issue of material fact concerning whether outage work on Point Beach turbines is an improvement to real property.

In *Kohn,* The Supreme Court of Wisconsin articulated the test to determine "whether a given item qualifies as an improvement to real property." *Kohn v. Darlington Cmty. Sch.*, 2005 WI 99, P17 (Wis. 2005). An "improvement" is any "'permanent addition to or betterment of real property that enhances its capital value and that involves the expenditure of labor or money and is designed to make the property more useful or valuable as distinguished from ordinary repairs.'" *Id*. (quoting *Kallas Millwork Corp. v. Square D Co.*, 66 Wis. 2d 382, 386 (1975)). The

17

Defendant relies on this same definition in its argument for summary judgment. (Pl.'s Ex. 22, at 7.)  The Wisconsin Court of Appeals, District I, held that, "daily repairs are not improvements to real property as that phrase is used in the statute of repose. The legislature has chosen to protect persons or entities which make permanent improvements to real property, not to absolve those who make regular repairs or do maintenance[3] work." *Peter v. Sprinkmann Sons Corp.*, 2015 WI App 17, P23 (Wis. Ct. App. 2015).

III. Westinghouse is a manufacturer or producer of turbine insulation material

Protection under the CSOR does not extend to Westinghouse because of their role as a "manufacturer or producer" of the asbestos containing insulation material. The CSOR "does not affect the rights of any person injured as the result of any defect in any material used in an improvement to real property to commence an action for damages against the manufacturer or producer of the material." Wis. Stat. § 893.89(2).

Drawing all inferences in Plaintiff's favor, Westinghouse's engineering department issued standard process specifications to "manufacture" or "produce" the turbine insulation. The process specifications were used for all Westinghouse turbines and were not unique to Point Beach. The Westinghouse insulation process specifications existed before the Point Beach project. The specifications specify materials must be asbestos containing. The insulation material was made by following the customary and normal process described in the specifications.  The standard specifications were used at Point Beach.

A manufacturer is "one who by labor, art, or skill transforms raw materials into some kind of finished product or article of trade." Black's Law Dictionary 965 (6th ed. 1990). A

---

[3] The *Peter* decision defines maintenance as the "work of keeping something in proper condition; upkeep."

producer is one who "makes or originates" "goods" "by hand, or with tools, machinery, chemicals, or the like." Black's Law Dictionary 1209 (6th ed. 1990).

The Wisconsin Supreme Court has stated: "material providers . . . are excluded based on their prior conduct of designing or manufacturing the material." *Kohn v. Darlington Cmty. Sch.*, 2005 WI 99, P67 (Wis. 2005). The CSOR excludes material producers when the "defects will exist regardless of the use to which the material is put." *Id.* at P72.

Here, the alleged defect in insulation material is that it releases asbestos fibers when removed or installed. Following the standard Westinghouse process specifications, the insulation material would release asbestos no matter where it is used. Westinghouse as manufacturer or producer of the insulation material pursuant to standard process specifications is excluded from CSOR protection under *Kohn*.

Whether evidence Plaintiff presented makes Westinghouse a manufacturer or producer of insulation "material" used at Point Beach is a genuine issue of fact for the jury to determine. The Court can then apply the CSOR after the jury's determination.

IV. The turbine system insulation was not defective

Under Wisconsin case law the only claims barred by the CSOR are those arising from injuries caused by a "defect or deficiency" in construction of the improvement. CBS has not provided evidence the turbine insulation was defective or deficient to meet the statutory requirement. In the time period of the Nuutinen's exposures at Point Beach, the use of asbestos insulation was the customary and normal practice according to witnesses and as shown by the process specifications of Westinghouse requiring such material. No evidence has been provided

19

to show the Point Beach insulation was improperly installed, failed to meet specifications, or failed to perform the function of protecting against heat loss.

Nuutinen's exposures did not result from asbestos insulation in place on the turbine structure. The turbine system was properly constructed, including the insulation materials. Rather the injuries resulted from the airborne fibers released during handling, installing, removing, or cleaning up asbestos containing insulation materials. The condition of airborne asbestos was normal during insulation work. The airborne asbestos was not a "defect or deficiency" in the improvement - a turbine system - to which Wis. Stat. § 893.89 applies. The controlling case is the Wisconsin Supreme Court's decision in *Mair v. Trollhaugen Ski Resort*, 291 Wis.2d 132, 715 N.W.2d 598 (2006). *Mair* held that "§ 893.89 only bars negligence claims resulting from injuries caused by "structural" defects. 291 Wis. 2d at 155, ¶37.[4]

Wisconsin asbestos case law recognizes injuries in asbestos cases are caused not by structural defects. In *Calewarts v. CR Meyer and Sons Co.*, 344 Wis. 2d 124, 820 N.W.2d 156, 2012 Wis. App. LEXIS 531, at *15-16, ¶24 (Ct. App. 2012),[5] the court wrote: "Calewarts cites no evidence that the insulation was improperly installed or otherwise defective. While asbestos may be inherently dangerous, it is well-known that it is harmless if not disturbed."

The court in *Viola v. Wisconsin Electric Power Co.*, 2014 WI App 5, 352 Wis. 2d 541, 842 N.W.2d 515 (Ct. App. 2013), followed *Calewarts* and concluded the airborne release of asbestos fibers from the normal and customary "installation, repair, and removal" of asbestos-containing materials is an "unsafe condition" rather than a structural defect. 2014 WI App 5, ¶25. The basis for the holding in *Viola* was articulated as:

---

[4] *Mair* involved a premises liability claim which is based on negligence.
[5] *Calewarts* is unpublished and is being cited for its persuasive value pursuant to Wis. Stat. § 809.23(3)(b). A copy of the ruling in *Calewarts* is attached. (Pl.'s Ex. 23.)

20

The decedents worked in buildings where pipes were covered with asbestos-containing insulation. The regular maintenance and/or repair of the premises required that the asbestos be disturbed. The asbestos was disturbed-in some instances by the decedent while performing work in the usual way as required by the decedent's employer and/or the building owner.

*Viola*, 2014 WI App 5, ¶¶ 21, 25. The asbestos containing materials at Point Beach Powerhouse are no different than those in *Viola* or *Calewarts*. The use of asbestos insulation material and techniques for handling, installation, removal, and cleanup of the materials are the same usual and customary (non-negligent) methods for the relevant time frame recognized in those cases. *Viola*, 2014 WI App 5, ¶¶8, 25.

Nuutinen does not allege construction of the turbine system or any part of the powerhouse units was structurally defective or deficient because of the use of asbestos. Plaintiff does not claim that a structural defect caused Charles Nuutinen's mesothelioma. Defendant, who shoulders the burden of proof in raising this affirmative defense, provides no evidence of a "defect or deficiency" in the turbine system or structural defect attributable to asbestos. Defendant fails, for example, to produce evidence the asbestos-containing insulation was of inferior quality, failed to conform to specifications, were improperly installed, or otherwise made the structure defective.

As in *Viola*, Nuutinen alleges in the complaint that decedent's injury "was (being) exposed to asbestos dust or fibers emanating from the asbestos products and/or asbestos insulated equipment which was sold, manufactured, mined, distributed, packaged, installed or otherwise placed into commerce by defendants." (Pl.'s Ex. 24, at ¶11.) The airborne fibers, not those in place on the structure, are the dangerous condition and cause of the injury.

Asbestos fibers have several properties which contribute to the dangerous conditions that exist when the fibers become airborne.

Case 2:97-cv-00678-RTR   Filed 03/20/15   Page 21 of 30   Document 187

- a small sized piece of asbestos - the size of a sugar cube - contains billions of fibers. (Pl.'s Ex. 25, at ¶120.)

- The fibers stay suspended in the air for hours. (Pl.'s Ex. 26, at 8-10 of General Exposure Report.)

- The fibers are carried in the air for great distances. (Pl.'s Ex. 26, at 8-10 of General Exposure Report.)

- After the fibers settle out of the air, they are easily resuspended. (Pl.'s Ex. 26, at 8-10 of General Exposure Report.)

These dangerous properties are due to asbestos fibers floating in the air and being inhaled. The dangerous properties do not exist when the fibers are in place as part of the turbine system structure.

Viola and Calewarts are decisions which recognize asbestos materials are dangerous only when disturbed and released into the air by being handled, installed, removed, or cleaned up in ordinary and customary ways. The asbestos containing materials which remain in place on piping systems, boilers, turbines, or other "structural" equipment are not the causes of the injury.

*Material and equipment providers*

The necessity of the defect or deficiency being "structural" applies to manufacturers and suppliers of material or equipment and to contractors overseeing the work on site. The claims against product suppliers, contractors, and premise owners are all based on negligence. Westinghouse served as both a product supplier and contractor on site. Westinghouse also occupied and controlled the work area in the same manner as an employer under the premises liability statute. The Wisconsin Supreme court in *Mair* relied on the legislative history of the

22

statute reflecting legislative intent to protect from lawsuits involving "structural" defects. 2006 WI 61, ¶35. To accomplish the legislative intent, the structural defect requirement must apply equally to all entities in the construction process similarly situated with respect to their legal duties. For example in *Calewarts* the court rejected the CSOR defense asserted by CR Meyer, an independent contractor that supplied and removed asbestos materials at work sites where the decedent was employed. 2012 Wis. App. LEXIS 531, at *25-29, ¶¶39-45.

Additionally, if the CSOR is interpreted to create differing liabilities based on classifications of entities involved in construction, the statute becomes unconstitutional on equal protection grounds. The court in *Kallas Millwork Corp. v. Square D Co.*, 66 Wis. 2d 382, 389, 225 N.W.2d 454 (1975), deemed unconstitutional and struck down an earlier version of the CSOR that "accorded special immunities to architects and contractors." A similar result was reached in *Funk v. Wollin Silo & Equip., Inc.*, 148 Wis. 2d 59, 67, 435 N.W.2d 244 (1989), where the 1979 revision of the CSOR was still found to be violate equal protection guarantees by excluding owners and occupiers.

The use of asbestos containing materials was also proper – not a defect in the insulated equipment - under government regulations which existed when Nuutinen was exposed. Wisconsin had laws regulating the use of asbestos materials which were in place since 1947 as regulations of the Wisconsin Industrial Commission. Use of asbestos was regulated, but was not prohibited under these regulations. The federal OSHA regulations enacted in 1972, which superceded the Industrial Commission regulations, also regulated but did not ban the use of asbestos. The regulations only applied to the limit levels of airborne asbestos fibers and mandate certain protective measures be used when asbestos materials were disturbed. (Ex. B24 at 13, ex 34 at 1-2.)

23

V. Westinghouse was an occupier during maintenance

Assuming CBS is correct that outage work is an improvement to real estate, the outage work by CBS falls within a statutory exception. Under § 893.89(4)(c), the statute does not apply to an "owner or occupier of real property for damages resulting from negligence in the maintenance, operation or inspection of an improvement to real property." Wis. Stat. § 893.89(4)(c). An occupier "can control what goes on on premises." Black's Law Dictionary 1078-79 (6th ed. 1990). Plaintiff cited evidence above which creates a genuine issue of fact about whether Defendant was an occupier during outage work at Point Beach.

Plaintiff presented evidence that Westinghouse directed and supervised Point Beach outages. Westinghouse had control of and occupied turbine work areas during outages. Westinghouse was responsible for and directed installment, removal, and cleanup related to insulation materials and specified the raw materials used in insulation materials. Defendant has presented no evidence that Westinghouse was not in control of the Point Beach turbine area during outage work. Defendant has not reached their burden of showing there is no dispute as to whether there is a general issue of material fact concerning whether Westinghouse was an occupier during outage work on Point Beach turbines.

VI. Nuutinen had "damages that were sustained" before April 29, 1994

The disease process in decedent Nuutinen was active, progressive, and irreversible beginning no later than the 1960s (the date Nuutinen was first exposed to asbestos) -- decades before the effective date of the CSOR. The disease process included retained fibers producing genetic mutations to DNA, changes in cellular structure and function, and other abnormal reactions such as free oxygen radicals within the body.

Plaintiff acknowledges the Wisconsin Court of Appeals recently held in *Peter v. Sprinkmann Sons Corp.*, 2015 WI App 17, P23 (Wis. Ct. App. 2015), that the damages sustained exception did not apply to a latent asbestos related disease before diagnosis. However, the Court of Appeals did not consider the evidence of ongoing injury caused by asbestos disease which could be compensated before diagnosis.

## VII. Constitutional right to a remedy

Wis. Stat. §893.89 is unconstitutional as applied if held to bar claims for asbestos related conditions diagnosed after April 29, 1994 as the result of exposures and wrongful conduct which occurred to trigger asbestos disease process before that date. Wis. Const. Art. I, §9, guarantees the right to a remedy. Article I, Section 9, states:

> Every person is entitled to a certain remedy in the laws for all injuries, or wrongs which he may receive in his person, property, or character; he ought to obtain justice freely, and without being obliged to purchase it, completely and without denial, promptly and without delay, conformably to the laws.

Interpreting "damages that were sustained" in a manner that excludes injuries would result in an improper ex post facto law taking away the rights of injured parties. Statutes should be interpreted in a way to uphold them rather than render them unconstitutional. *Gelencser v. Industrial Com.*, 31 Wis.2d 62, 66 (1966).

Wisconsin did not have an enforceable construction statute of repose before enactment of Wis Stat. §893.89 effective April 29, 1994. Two predecessor versions of Wisconsin's construction statute of repose were declared unconstitutional before that date. *Funk v. Wollin Silo & Equipment, Inc.*, 148 Wis.2d 59, 435 N.W.2D 244 (1989), and *Kallas Millwork Corp. v. Square D Co.*, 66 Wis.2d 382, 393 (1975). Absent a constitutionally valid CSOR during the period of defendant's' wrongful conduct and Nuutinen's asbestos exposures, Nuutinen had a right

to recover for all harms from the latent asbestos disease process which began before the CSOR's 1994 effective date.

*Wisconsin case law*

When evaluating the constitutional protection to be afforded to the right to a remedy for Nuutinen's mesothelioma, the court should consider evidence the wrongful conduct had occurred and the asbestos disease process was already underway. Defendants knew or should have known the dangers of asbestos and had caused exposures to Nuutinen before the CSOR was effective in 1994. The disease process was also underway before April 29, 1994. By that date all the following events and evidence relating to the claims now asserted by Nuutinen had occurred or existed.

- the dangers of asbestos were known. (Pl.'s Ex. 25, at ¶¶ 55-100.)
- the wrongful conduct had been committed,
- products were placed in the stream of commerce,
- asbestos fibers were airborne at Nuutinen's worksites,
- no warnings were provided,
- no safety instructions were provided,
- Nuutinen's exposures had occurred,
- asbestos fibers were lodged in Nuutinen's lungs,
- the disease process of a series of genetic mutations is underway,
- medical causation of future unknown harms has begun.

The only unknown factor is the extent of the ultimate harm. The ultimate harm cannot be known as a result of hidden and progressive disease process which is not within the victim's control. Constitutional protection of right to recover for the future unknown harms is necessary under these circumstances.

The "certain remedy" required by Article 1, Section 9, of the State of Wisconsin Constitution is generally held to mean "a day in court." *Metzger v. Wisconsin Dep't of Taxation*, 35 Wis. 2d 119, 129 (1967). The interpretation sought by defendants denies that day in court for

Nuutinen and practically all victims of the asbestos disease process due to the latency period for the disease exceeding the 10 year period allowed for suit under the CSOR.

This situation is unlike those where a remedy is denied based upon the law as it existed at the time of the wrongful conduct. *Aicher v. Wisconsin Patients Compensation Fund*, 613 N.W.2d 849, 863 (Wis. 2000) (claim for injury caused in 1982 is barred by medical malpractice statutes of repose enacted in 1975 and 1979). Nuutinen was exposed to asbestos fibers, and his disease process began long before the April 29, 1994, effective date of the CSOR. When the wrongful conduct occurred and the disease process began, established remedies were available to Nuutinen under tort law for negligence and strict products liability.

Wisconsin Supreme Court cases recognize the constitutional infirmity where remedies were denied by earlier versions of Wis. Stat. §893.89. In *United States Fire Insurance Company v. E.D. Wesley Company*, 105 Wis.2d 305 (Wis. 1982), the facts involved a pipeline which was built by the defendants in 1953 and ruptured in 1978 causing an oil spill. The applicable construction statute of repose at the time was §893.155, Stats, 1977, which was effective on June 13, 1976, and renumbered in 1980 to §893.89. Reversing the decision of the Court of Appeals that the action was barred, the Supreme Court found the damages were sustained in 1978.[6] 105 Wis.2d at 317. Despite finding the damages were sustained after the statutory effective date, the court ruled the statute could not be read to retroactively bar the claim which existed in 1953. The court cited to the "general rule in Wisconsin that legislation is presumptively prospective":

> The general rule in Wisconsin is that legislation is presumptively prospective unless the statutory language clearly reveals either expressly or by necessary implication an intent that the statute apply retroactively. *State v. ILHR Department*, 101 Wis. 2d 396, 403, 304 N.W.2d 758 (1981), citing *Hunter v. Sch. Dist. Gale-Ettrick-Trempealeau, 97 Wis.* [***23] *2d 435, 442-43, 293 N.W.*2d 515 (1980).

---

[6]Unlike the instant case, no claim was made in *U.S. Fire Insurance* of a latent disease process that began during the 1953 construction.

This court recently reiterated: "The general rule of statutory construction is that statutes are to be construed as relating to future and not to past acts." *Gutter v. Seamandel*, 103 Wis. 2d 1, 17, 308 N.W.2d 403 (1981).

105 Wis.2d at 319. By construing the statute to only apply prospectively, the court in *U.S. Fire Insurance* was able to avoid ruling whether §893.155 was unconstitutional under Article I, Section 9, the "right to a remedy" clause of the Wisconsin Constitution. The court stated:

It is a fundamental rule of statutory construction that a court is required to avoid construing a statute in such a way as would render that statute unconstitutional. As stated in *Lewis Realty v. Wisconsin R. E. Brokers' Board*, 6 Wis. 2d 99, 108, 94 N.W.2d 238 (1959):

"[I]t is the duty of this court to so interpret a statute as to uphold its constitutionality if this can be reasonably done without doing violence to the accepted rules of statutory interpretation." See also, *Swanke v. Oneida County*, 265 Wis. 92, 98-99, 60 N.W.2d 756, 62 N.W.2d 7 (1953); *Rosenthal v. Kurtz*, supra, at 11-12.

In order to comply with the presumption of prospective application and avoid potential constitutional violation, we preserve the intent and integrity of sec. 893.155, Stats. 1977, by holding it is to be applied only to real property improvements substantially completed after the effective date of that statute. Since the statute of limitations contained in sec. 893.155 is prospectively applicable to the instant case, we need neither examine the merits of nor rule on petitioners' arguments concerning the statute's constitutionality.

105 Wis.2d at 319-320. The court recognized the constitutional problem, stating: "The statute cannot be applied to these plaintiffs to deny them their right to sue, since to do so would mean their right to sue had been negated by the time it accrued under previous statutory and common law rights." 105 Wis.2d at 316. The same potential constitutional issues are presented by the reading of the statue desired by defendant in this case. The time period for clinical detection of Mr. Nuutinen's disease and that of almost all asbestos claimants is longer than the ten year repose period. The improper result, as recognized in *U.S. Fire Insurance*, is to bar the right to sue before the claim can accrue.

The Wisconsin Supreme Court also recognized the constitutional issues of the right to a remedy in *Rosenthal v. Kurtz*, 62 Wis.2d 1 (Wis. 1974), which considered another predecessor

28

version of the CSOR that had also been codified at §893.155. As in *U.S. Fire Insurance*, the court chose a reading of the statue which avoided the issues. The court stated in *Rosenthal*:

> Sec. 893.155, Stats., however, not only bars a suit before the injured party is aware of his right to do so, but goes further and bars the right to sue before it arises. Yet sec. 893.14, the prefatory section to sec. 893.155 seems to indicate that in each of the limitations thereinafter specified a right of action exists subject to the bar of limitations. If such be the case, that there is a legislatively recognized right of action that arises when the injury is sustained, a serious constitutional question is posed if the legislature, in contravention of a right statutorily recognized by it, provides, in contravention to art. I, sec. 9, of the Wisconsin Constitution, that there will be no remedy for the wrong.

62 Wis. 2d at 8.

In accordance with the holdings of *U.S. Fire Insurance* and *Rosenthal*, this court should adopt an interpretation of the current version of §893.89 that has only prospective application for "wrongs" or "injuries" during construction improvements occurring before April 29, 1994. If the statute is read to have only prospective application or "damages sustained" is read to include the latent asbestos disease process, the constitutional issues under Article I, Section 9, of the Wisconsin Constitution are avoided.

This court should also consider a primary public policy underlying the enactment of the statute of repose is to protect those involved in construction from future events over which they have no control. Examples of these are later failures to properly "maintain" the improvement or the "stress, strain, wear and tear" on the improvement as time passes. The rationale was discussed in *Funk v. Woolin Silo and Equipment, Inc.*, 148 Wis.2d 59 (1989), where the Wisconsin Supreme Court cited to legislative findings that accompanied revision of the CSOR in 1976. Subsequent to the completion of construction, persons involved in the planning, design and construction of improvements to real estate lack control over the determination of the need for, the undertaking of and the responsibility for maintenance, and lack control over other forces, uses and intervening causes which causes stress, strain, wear and tear to the improvements and in

29

most cases have no right or opportunity to be made aware of or to evaluate the effect of these forces on a particular improvement or to take action to overcome the effect of these forces. 148 Wis.2d at 65. Since harmful effects of asbestos were known at the time of Nuutinen's exposures, the public policy to protect from lawsuits based on future unexpected events after the construction has no application.

<u>Conclusion</u>

The evidence needed to show the affirmative defense of the CSOR either has not been presented or requires a jury to resolve disputed issues of material fact. Other legal issues also preclude application of the CSOR. The motion based on Wis. Stat. §893.89 should be denied.


Dated: March 20, 2015

<u>/s/    Robert G. McCoy</u>

Cascino Vaughan Law Offices, Ltd.
Allen D. Vaughan
Michael C. Cascino
Robert G. McCoy
220 S. Ashland Avenue
Chicago, Illinois 60607-5308
tel: 312-944-0600
fax: 312-944-1870
e-mail: bmccoy@cvlo.com